Peter W. Billings, A0330
Jason W. Hardin, A8793
Timothy K. Clark, A10778
FABIAN & CLENDENIN,
  A Professional Corporation
Mailing Address:
  P.O. Box 510210
  Salt Lake City, Utah 84151-0210
Physical Address:
  215 South State Street, 12th Floor
  Salt Lake City, Utah 84111
Telephone:     (801) 531-8900
Facsimile:     (801) 596-2814
E-mail:        pbillings@fabianlaw.com
               jhardin@fabianlaw.com
               tclark@fabianlaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MONITRONICS INTERNATIONAL, INC., a Texas corporation; MONITRONICS FUNDING, LP, a Delaware limited partnership; and MONITRONICS SECURITY, LP, a Delaware limited partnership;<br><br>    Plaintiffs,<br><br>vs.<br><br>PINNACLE SECURITY, LLC., a Utah limited liability company; CHAD CHRISTOFFERSON, an individual; MOSES HAWKINS, an individual; ALLSYSTEMS SECURITY PROFESSIONALS, INC. d/b/a SAFEHOME SECURITY SYSTEMS, a Utah corporation; ALARMEX SECURITY, INC., a Utah corporation, and its successor in interest, VIGILON SECURITY, INC., a Utah corporation; and JOHN DOES 1-20;<br><br>    Defendants. | **DECLARATION OF ROBERT N. SHERMAN IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR LIMITED EXPEDITED DISCOVERY**<br><br>**Civil No. 2:07-cv-575**<br><br>**Honorable Dee Benson** |

I, Robert N. Sherman, declare as follows:

1. I am the Vice President, Operations, of Monitronics International, Inc. (**"Monitronics"**).

2. I have worked in the security alarm and monitoring business for over twenty (20) years. I have been the Vice-President, Operations, of Monitronics since its founding in 1994. In my position as Vice-President, Operations, I am responsible for managing and overseeing Monitronics' customer account portfolio, including the areas of customer attrition and retention. In the past thirteen years as Vice President, Operations, for Monitronics, I have become familiar with the manner in which Monitronics acquires customer accounts. In my over twenty years in the security alarm and monitoring business, I am familiar with the business operations, and business models of other participants in the industry.

3. Monitronics is the nation's fourth-largest alarm monitoring service provider, providing service to over 500,000 residential and business customers throughout the United States. This involves the monitoring of signals from the homes and businesses of Monitronics' customers, which may arise from burglaries, fires and other events. The alarm monitoring is done at the company's central monitoring station in Dallas, Texas.

4. Within the security monitoring industry, independent dealers solicit customers for alarm monitoring service through a variety of methods, including door-to-door and telemarketing. The door-to-door solicitation is done primarily in the summer months as some independent dealers primarily use college students to do the solicitation during their summer breaks. These independent dealers begin their recruiting of these students each fall for the following summer. Based on my experience and knowledge in the security alarm and monitoring

industry, I am aware that Pinnacle Security, LLC (**"Pinnacle"**) employs a significant number of college students for their door-to-door solicitation during the summer months.

5. Where the dealers' salespersons are successful in signing up customers, the dealer typically enters enter two contracts with the customer, one for the sale and installation of the alarm monitoring equipment (the **"Installation Agreement"**) and a second alarm monitoring agreement related solely to the monitoring of the customer's premise (the **"Customer AMA"**).

6. The typical Customer AMA provides for the monitoring of that customer's premises for a stated term, usually three (3) years, with automatic one year renewals thereafter. The average lifespan of a Customer AMA is for a period of eight (8) to ten (10) years. Attached hereto as **Exhibit A** is a true and correct copy of a typical Customer AMA for both AllSystems Security Professionals, Inc. d/b/a Safehome Security (**"AllSystems"**) and Alarmex Security, Inc. (**"Alarmex"**).

7. The independent dealers usually offer the Customer AMA's to alarm monitoring companies, such as Monitronics, to purchase. Monitronics obtains most of its customers from such independent dealers in accordance with Alarm Monitoring Purchase Agreements (**"Dealer AMPA's"**) between each of those dealers and Monitronics. The Dealer AMPA's give Monitronics the right of first refusal to purchase Customer AMA's. Attached hereto as **Exhibit B** is a true and correct copy of the Dealer AMPA between Monitronics and AllSystems. Attached hereto as **Exhibit C** is a true and correct copy of the Dealer AMPA between Monitronics and Alarmex. Alarmex changed its corporate name to Vigilon Security, Inc. (**"Vigilon"**) in 2004.

8. Before it purchases a Customer AMA, Monitronics conducts due diligence on the customer. As part of this due diligence, Monitronics asks if the potential customer is currently under contract with another alarm monitoring service. If Monitronics learns that the potential customer is under contract with a competitor, Monitronics does not acquire the Customer AMA from that independent dealer.

9. When Monitronics acquires a Customer AMA, Monitronics generally does not realize profit on it unless that customer extends its alarm monitoring service beyond the initial three (3) year term. As described above, the average customer lifespan with Monitronics is eight (8) to (10) years.

10. The independent dealers recognize and understand that Monitronics will likely service the Customer AMA's for a period far in excess of the initial three (3) year term. The Dealer AMPA's state that this is a *fundamental expectation* of Monitronics, and the dealers all know, understand and agree that Monitronics is paying them a premium based on this fundamental expectation and is requiring from them a nonsolicitation agreement to protect this fundamental expectation. Specifically, the Dealer AMPA's state:

> Seller [e.g., AllSystems and Alarmex] acknowledges that one of the fundamental expectations of Purchaser [i.e., Monitronics] in acquiring the Contracts [i.e., the Customer AMA's] is that the Contracts will be renewed by the Subscriber after expiration of their current terms and Seller acknowledges that Contracts customarily are so renewed. Accordingly, in consideration of Purchaser's payments . . . which Seller hereby acknowledges and agrees constitutes good and valuable consideration, Seller agrees with Purchaser that neither the Seller nor any of its shareholders, partners, members, owners, officers, directors, partners shall, at any time within fifteen (15) years from the date such contract was acquired by Purchaser from Seller, directly or indirectly, in any capacity, contact, solicit, or attempt to knowingly solicit or accept unsolicited

> monitoring or alarm installation business from the Subscriber to whom such Contract related . . . .

AllSystems Dealer AMPA, Ex. B hereto, §2.03; Alarmex Dealer AMPA, Ex. C hereto, §2.03.

11.  Based on my experience in the industry, nonsolicitation provisions like ours are common in contracts between dealers and alarm monitoring service providers.

12.  For additional protection of the fundamental expectation describe above, we also require the principals of independent dealers to individually enter into ancillary agreements, which are addenda to the Dealer AMPA's and which extend the nonsolicitation requirements, among other things, to those individual principals. These "Individual Nonsolicitation / Noncompete Agreements" (often "**Exhibit E**" to the Dealer AMPA's) also acknowledge the fundamental expectation of customer renewal and acknowledge that, in consideration for Monitronics' payment, the independent dealers, such as AllSystems and Alarmex, and their principals agree that they will not, within fifteen (15) years from the date of the sale of a Customer AMA, solicit the monitoring or alarm installation business from that customer. Chad Christofferson, individually and as principal of Allsystems and Alarmex, signed such Individual Nonsolicitation / Noncompete Agreements and also agreed not to sell or convey any customer lists or other information of AllSystems and Alarmex or otherwise related to the Customer AMA's. *See, e.g.*, AllSystems Dealer AMPA, Exhibit B hereto, at Exhibit E thereto, at 23, ¶1; Alarmex Dealer AMPA, Exhibit C hereto, at Exhibit E thereto, at 23, ¶1.

13.  Because of the importance of long-lasting relationships with our customers, Monitronics employees attempt to contact all customers from whom we receive a cancellation notice to determine the reason for the cancellation and to attempt to retain them as customers.

Once a customer has cancelled, however, it is difficult for Monitronics to persuade them to return to Monitronics. Of the total number of customers that cancel their alarm monitoring service, Monitronics employees are typically able to contact and interview around 30% of those lost customers. And of those 30% we contact, we do not necessarily determine why each was canceling, but we are able to persuade approximately 10% to 15% to stay with Monitronics. We have no way of determining the reasons for cancellation for approximately 70% of our terminating customers because we are unsuccessful in contacting them.

14. When the AllSystems Dealer AMPA and the Alarmex Dealer AMPA were in effect, Monitronics purchased a substantial number of Customer AMA's from each of Allsystems and Alarmex / Vigilon.

15. As a principal of both Allsystems and Alarmex, Christofferson was intimately familiar with both the AllSystems Dealer AMPA and the Alarmex Dealer AMPA, and he had complete access to the information about the Customer AMA's purchased by Monitronics from Allsystems and Alarmex / Vigilon.

16. Both the AllSystems Dealer AMPA and the Alarmex Dealer AMPA are no longer in effect and neither company is currently an Authorized Dealer of Monitronics.

17. Pinnacle, of which Christofferson is now a principal, is not, and never has been, an Authorized Dealer of Monitronics. Instead, it sells Customer AMA's to other alarm monitoring service providers. One of the primary, if not the only, monitoring service providers that deals with Pinnacle is Security Associates International, Inc. ("**SAI**").

18. Early this summer, a significant and unusual number of customers began canceling their monitoring service contracts. The rate of attrition was unusually high in many

different geographic areas, such as Detroit, Michigan; Gary, Indiana; Chicago, Illinois; Minneapolis/St. Paul, Minnesota; Kansas City, Missouri; and Denver, Colorado. In some of those areas, Monitronics lost two (2) to five (5) times the number of accounts in May–June of this year as compared to those that Monitronics lost in May–June of last year.

19. In the Detroit, Michigan area, for example, we lost 319 customers in May–June of 2007, whereas we only lost 124 customers during the same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Detroit, Michigan area to terminate their Customer AMA's with Monitronics.

20. In addition, in the Gary, Indiana area, we lost 257 customers in May–June of 2007, whereas we only lost 48 customers during the same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Gary, Indiana area to terminate their Customer AMA's with Monitronics.

21. We also lost 646 customers in the Chicago, Illinois area in May–June of 2007, whereas we only lost 439 customers during the same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Chicago, Illinois area to terminate their Customer AMA's with Monitronics.

22. In the Minneapolis/St. Paul, Minnesota area, as another example, we lost 505 customers in May–June of 2007, whereas we only lost 255 customers during that same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Minneapolis/St. Paul, Minnesota area to terminate their Customer AMA's with Monitronics.

23. And in the Kansas City, Missouri area, we lost 107 customers in May–June of 2007, whereas we only lost 28 customers during that same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Kansas City, Missouri area to terminate their Customer AMA's with Monitronics.

24. Additionally, in Denver, Colorado, we lost 551 customers in May–June of 2007, whereas we only lost 182 customers during that same period in 2006. We have not been able to verify the cause of all of these attritions as we are unable to interview all of the terminating customers. But, based on our discussions with customers, Pinnacle has wrongfully induced a significant number of Monitronics customers in the Denver, Colorado area to terminate their Customer AMA's with Monitronics.

25. I do not yet have the attrition data for the month of July, 2007, but based on my discussions with our customer service staff I expect attrition to continue to be unusually high in these and perhaps other market areas.

26.  As a result of numerous Monitronics' customers reporting misrepresentations by salespersons earlier this year, Monitronics created a form for its employees to use in customer interviews with those terminating customers—the "Summer Attrition Postcard–Response Form" (the **"Attrition Form"**).

27.  In order to memorialize oral conversations with customers, Monitronics' employees contemporaneously enter the information given by the customers during the interview into an electronic database (the **"Customer Notes"**) and, when a customer was seeking termination and other suspicious activities were apparent, on the Attrition Forms.

28.  Among other information, the Attrition Forms contain the following information: what the salesperson told the terminating customer in order to get the customer to change from Monitronics to a competitor; what company the salesperson purported to represent; the central monitoring station; whether the salesperson offered a system upgrade or a new system and what elements were allegedly added; whether they were happy with Monitronics' monitoring and service; whether they intended to cancel their service prior to the visit from the salesperson; whether the salesperson canceled their monitoring service for them; whether the terminating customer thought the information given to them was deceptive; and particularized notes regarding or statements from the customer.

29.  I am aware of at least 130 Monitronics customers who have canceled their accounts and signed up with Pinnacle since May 1, 2007.  Some of these canceled Customer AMAs previously purchased by Monitronics from AllSystems and Alarmex pursuant to the AMPAs referred to above and thus subject to the non-solicitation provisions.  This number of 130 is based upon the over forty-five (45) cancellation letters Monitronics received either on

9

Pinnacle stationary or identified as being sent from a Pinnacle facsimile, attached hereto as **Exhibit D**, in addition to over ninety (90) Attrition Forms identifying Pinnacle as the sales company who approached the customer. (Attached hereto as **Exhibit E** are true and correct copies of the Attrition Forms for customers who Monitronics' employees were able to contact and interview and who we can identify as having been wrongfully induced by Pinnacle to switch to Pinnacle this summer.) Many of the customers could not remember the names of the company which called on them, but I believe some of these were Pinnacle salespeople. We are receiving additional cancellation letters and Attrition Forms daily, and this number will likely only go up.

30. Attached hereto as **Exhibit F** are true and correct copies of redacted Customer Notes relating to Pinnacle conduct involving many of those same customers. In light of the fact that we are not able to contact all of the terminating customers, there are likely more customers who were wrongfully induced to switch to Pinnacle.

31. Based on Monitronics' employees' interviews with our terminating customers, Pinnacle salespersons are making false statements to Monitronics' customers, including, but not limited to the following: that Monitronics "is going out of business," that "Pinnacle is acquiring, merging with or has taken over Monitronics," that "SAI [a security alarm monitoring service] and Monitronics were merging," that "Pinnacle is taking over the monitoring of Monitronics' accounts" or has "purchased the Customer's account from Monitronics," that "Monitronics is changing its name," or that the salespersons are in fact "with Monitronics."

32. In addition to these deceptive statements, we have reports of Pinnacle salespersons showing Monitronics' customers Monitronics' badges or I.D. cards, Monitronics' marketing and sales materials, or using Monitronics' name to get inside the customer's house in

relation to making "updates" or "upgrades." Based on our interviews with terminating customers, it is common for Pinnacle salespersons to describe the proposed changes to the customers' alarm systems and monitoring services merely as "updates" or upgrades," without disclosing to the Customers that they are signing new agreements with new companies that change alarm monitoring service providers.

33. In addition, we have reports of Pinnacle salespersons "making" customers sign new Customer AMA's with Pinnacle, sending cancellation letters to Monitronics without the customers' authorization, and calling into Monitronics impersonating a Monitronics' customer and seeking to cancel that customer's account.

34. Despite the representations to the contrary made to Monitronics' customers by Pinnacle salespersons, Monitronics is not going out of business. Pinnacle is not acquiring, merging with or taking over Monitronics. SAI is not acquiring, merging with or taking over Monitronics. First Line Security is not acquiring, merging with or taking over Monitronics. Pinnacle has not purchased any Monitronics' Customer AMA's or accounts. Monitronics is not changing its name. Monitronics is not working with any Pinnacle salesperson under any Dealer AMPA or other agreement known to me as the Vice President, Operations, and there is no corporate connection or affiliation between Pinnacle and Monitronics.

35. Monitronics has also not authorized Pinnacle salespersons to hold themselves out as Monitronics representatives or as being "with Monitronics." Monitronics has never given Pinnacle or its employees or agents or anyone acting on its behalf the permission to use Monitronics' trademarks, name, sales or marketing materials, badges, or I.D. Cards. Monitronics

has not given Pinnacle permission to use any confidential customer information, customer lists, details of Customer AMA's or customer passcodes.

36. Based on reports from Monitronics employees under my supervision and my review of the Attrition Forms and Customer Notes, Pinnacle's conduct of its sales personnel described above began occurring at least as early as May 2007 and is continuing to occur in multiple states throughout the country.

37. The above conduct has significantly disrupted and damaged our business, such that Monitronics has been damaged well in excess of $75,000.00. Most of the customers who have switched from Monitronics to Pinnacle are effectively lost forever, and Monitronics will not experience the typical multiple year renewal pattern that it experiences with most of its customers.

38. Monetary remedies are insufficient to provide redress against the offending conduct, should it be allowed to continue. The relationship that we have with our customers, our goodwill, and our name in the community that we have spent over thirteen (13) years building, have all been irreparably injured and will continue to be injured if the offending conduct is not stopped because, among other things, many of our customers and likely their neighbors, family and friends now think Monitronics is going, or has gone, out of business or has merged with Pinnacle or some other company when no such thing is true. In addition, the conduct described above and in the Attrition Forms and Customer Notes, has disrupted and will continue to disrupt the lives, sense of security, and security of our customers.

39. Because of the above described conduct, I am aware that certain customers of Monitronics are now being double-billed for alarm monitoring services: once by Monitronics

(because they have time left on their initial three (3) year term), and once by Pinnacle. Some of the Attrition Forms show customers complaining about being doubled billed since they were not even informed that they were being switched to a different alarm monitoring company.

40. Double-billing has created confusion among customers as to whether customers are required to pay their bill for Monitronics, even though Monitronics is entitled by the Customer AMA to bill the customers through the initial term of their contract. Where customers do not pay their bill, those customers may be referred to a collections agency, which may impact their credit reports.

41. In addition to the billing issues, Monitronics' customer service employees have received and continue to receive telephone calls from terminating customers who insist that their alarms are being monitored by Monitronics, even though Monitronics has received a request purporting to be from that customer canceling their account. Given the nature of the industry, it is essential for customers to be able contact the alarm monitoring company in the event of a false alarm or real emergency.

42. As the Vice-President, Operations, for Monitronics, I have personal knowledge as to the phone system type of recording device used by Monitronics to record conversations of customers calling Monitronics.

43. All incoming customer service telephone calls have a recording at the beginning of the call that informs the caller that their telephone conversation may be recorded. In the ordinary course of business, Monitronics records all incoming customer service calls. The recording software that Monitronics uses to record all incoming customer service phone calls is called NICE, created by Nice Systems, Inc. Contemporaneous with the phone call, the NICE

program matches the customer's incoming caller ID with the customer's name. The NICE program stores the recording of the customer's incoming telephone call on the Monitronics server as an .aud file. When a recording is of interest to Monitronics personnel, the .aud files are converted in the regular course of business to .wav files because the .wav software is readily available to Monitronics personnel.

44. NICE automatically names the recorded and saved incoming customer telephone calls according to a pre-existing protocol. The file is named according to the caller ID of the incoming phone call, the date and the time of the incoming phone call.

45. Attached hereto as **Exhibit G** is a CD-ROM disc containing true and correct copies of all the recordings of incoming telephone calls in both .aud and .wav formats, purporting to be on the account of Albert Porter, from May 25, 2007 through July 12, 2007 created and stored by NICE. Two different incoming phone numbers were identified by the NICE system— one number with an 816 area code relating to Kansas City, Missouri, where Mr. Porter resides, and one number with an 801 area code from northern Utah. The 816 number is, according to our records, Mr. Porter's home phone number. I called the 801-372-3886 number and heard a voice mail message identifying someone named "Moses" who worked for "Pinnacle Security." I have since learned that Moses Hawkins is a salesperson for Pinnacle who worked in the Kansas City area this summer. I have also listened to the audio files attached hereto and recorded in the ordinary course of our business and think they speak for themselves.

I certify and declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of August 8, 2007.

/s/ Robert N. Sherman
Robert N. Sherman

ND: 4842-2084-8385, v. 1ND: 4842-2084-8385, Ver 1